HENNING M. SCHMIDT, Appellant, v. TOWN OF BATTLE CREEK et al., Appellees.

HIGHWAYS: Dedication—Strict Limitation. The public rights in
1  a dedicated highway will be strictly confined to the limits of the dedication, as clearly marked out and designated by the visible monuments erected by the dedicator.

HIGHWAYS: Consent Roads—Failure to Secure Consent of All
2  Owners. Principle recognized that the establishment of a *consent* road, without the consent of *all* the owners affected, is a nullity. (Sec. 1512, Code, 1897.)

*Appeal from Ida District Court.*—M. E. HUTCHISON,
Judge.

DECEMBER 16, 1919.·

REHEARING DENIED MARCH 17, 1920.

ACTION to enjoin the defendants from moving plaintiff's fence back along a public highway. Decree dismissing plaintiff's petition. Plaintiff appeals.—*Reversed.*

*Snell Bros.,* for appellant.

*Chas. S. Macomber* and *Campbell & Campbell,* for appellees.

GAYNOR, J.—This case involves a dispute over the territorial limitations of certain public highways. The action is to enjoin the town of Battle Creek and the city and

1. HIGHWAYS:
dedication:
strict limita-
tion.

county officers from widening the highways by setting back the fences that now and heretofore have marked these boundaries. One of the highways runs east and west through the center of Section 27, and the other along the south line of 27. These highways, as they now exist and as they have been used for the last 25 years, are not 66 feet wide. It is the claim of the defendants that they are and should be 66 feet wide, or 33 feet on each side of the section line. Defendants base this claim on the alleged fact that there were consent highways established by the board of supervisors on these lines on or about the year 1876, and that the statute fixed the width of a highway at 66 feet.

The record shows that, at that time, one Wagoner owned the south half of Section 27; that a man by the name of Teal owned the northeast quarter of 27 and the

southeast quarter of the northwest quarter

2. HIGHWAYS: of 27; and that the Iowa Railroad Land
consent ro
failure to Company owned the southwest quarter of
secure consent
of all owners. the northwest quarter. There is no show-
ing in this record as to the ownership of
the land in 34, immediately south of 27, abutting on that
south road. The only evidence of any consent to the estab-
lishment of either as a highway is found in two papers filed
by Wagoner on July 5, 1876, reading as follows:

"To Honorable Board of Supervisors of Ida County,
Iowa:

"This is to certify that I consent to the location of a
public highway along the north line of the south half of
Section 27, Township 87, Range 41, and on the line of the
south half of the northwest quarter of said section."

"To Honorable Board of Supervisors of Ida County,
Iowa:

"This is to certify that I consent to the location of a
public highway along the north line of the south half of
Section 27, etc., and on the south line of the south half of
the northwest quarter of 27."

The consent of no other property owners appears to
have been filed, nor is it claimed that any other or further
consent was given. It is claimed that, on this consent, the
board of supervisors established a road through the cen-
ter of Section 27, 66 feet wide, 33 feet on either side of the
half section line, and another road 66 feet wide on the
south line of Section 27, between 27 and 34, 66 feet wide.

At that time, the only law authorizing the establish-
ment of a public highway by consent was found in the
Code of 1873, Section 957, which reads as follows:

"Highways may be established without the appoint-
ment of a commissioner, provided the written consent of
*all the owners* of the land to be used for that purpose be
first filed in the auditor's office; and if it is shown to the

satisfaction of the board of supervisors, that the proposed highway is of sufficient public importance to be opened and worked by the public, they shall make ▮▮▮der establishing the same, from which time only shall it be regarded as a highway."

It is apparent, therefore, that the consent required by this statute to authorize the board to legally establish highways on these lines was not given. No highway could be established that would have the effect of taking any of the land owned by the nonconsenting owners. But roads were opened along both these lines, and the record discloses that they were opened in this way: Wagoner was a surveyor, and, after the filing of his consent, he undertook to survey his land, both on the north and on the south, for the purpose of ascertaining the section and half-section lines. At that time, he found what he believed to be the government corners, and made his survey accordingly, and staked off a portion of his land, to be used as a public highway. His land was all south of the half-section line of 27. On the half-section line, he made measurements indicating the portion of his land to be devoted to public use. He drove stakes. He built a hedge, marking the south line of the land so dedicated to public use. This hedge subsequently died. Thereafter, he placed cottonwood trees and a fence along this line, indicating the south line of the highway which he proposed dedicating to public use. This was more than 25 years ago,—the exact date is not material. Without objection from the owners on the north, the road was opened and used, and a part of the land of these northern owners was appropriated to this public highway. It appears that Teal was there, at the time plaintiff made his survey, and staked the road. Teal's presence, without objection, would indicate that he consented to what Wagoner did. That road, as laid out by Wagoner, has remained there for all these years, and is still there, undisturbed, and

used by the public as a highway, within the limitations fixed by Wagoner. Both on the north and on the south of this half-section road, as laid out by Wagoner, each party has constructed fences, and tilled up to that line. The public has never, during all these years, asserted any right to use any land found outside of the line so marked and indicated by fences, trees, and hedges.

The same is practically true of the south road, except that it does not appear who are the owners of the land in Section 34, south of the south road; but the road was opened there as on the north. The lines were staked off, and visible monuments placed, indicating the north and south boundaries of the road. It has been used and traveled by the public, within the limits of these boundaries, for 25 years, at least. No claim was ever made by the public, until this time, that any rights exist in the public beyond the limitations marked. It is now proposed to move the half-section road south on plaintiff's land, and the south road north; and this on the ground that a recent survey shows the half-section line to be south of where it was thought to be by Wagoner, when he made his survey, and that the south section line is north of where it was supposed to be when Wagoner laid out the south road.

We are not concerned now to inquire into the correctness of these surveys. Whatever right the public has in either of these highways must come through a dedication of right to the public by the acts of the then owners, and the acquiescence in their acts by their subsequent grantees. The public right has its territorial limitations within the bounds of the territory dedicated. So far as the public or these defendants are concerned, their rights must be found either in prescription or dedication.

It will be noted that, in the Wagoner consent, no width of road is given, nor does it appear that any action of the board of supervisors fixed a definite width of road. It does

not appear that the public officials worked either of these roads during these years. The most we find in this record is that, after they were opened,—staked off, rather,—marked off by metes and bounds by Wagoner,—the public has then used them as public highways for all these years, but within the limits of the boundaries so fixed. Plaintiff is not disputing the public's right to use so much of the highways as was thus dedicated and used. His objection goes to the right of defendants to take more of his land than was thus dedicated to the public use.

Dedication involves the idea of giving certain specific lands to the public for public use, or a certain right or easement in land for a specific public purpose. Common-law dedications are divided into two classes, expressed and implied. In either, however, it is necessary and essential that there be a surrender or an appropriation of the land by the owner to the public use. An expressed dedication is evidenced by some explicit or positive act or declaration, such as manifests an intent to surrender the land to the use of the public. An implied dedication is evidenced by some act or course of conduct on the part of the owner from which a reasonable inference of intent to dedicate can be drawn. There must be an intent to dedicate, and, without the intent, shown in some way, there can be no valid dedication. The intent is, however, not sufficient. While the intent must exist, to make the dedication, yet there must be actual setting aside of the physical property to the public use, accompanied by the intent that it shall be so used. There must be a parting with the use of the property to the public, made *in praesenti,* manifested by some unequivocal act indicating clearly an intent that it be so devoted. The extent of the dedication, its scope and character, depend upon the intention of the dedicator, as manifested in the act of dedication, and the right of the public is limited to the physical property so set aside for the public use.

The public is not bound to accept dedication, though expressly dedicated to its use. An offer to dedicate does not become complete until there is an actual acceptance by those to whom the offer is made. The intent to dedicate, followed by a manifest purpose to expose the property to public use, when accepted by the public, becomes final; and the right of the public is limited territorially to the property dedicated and accepted by the public.

Here, we have evidence of a manifest purpose on the part of Wagoner to dedicate land for a road. He expressed his purpose in the consent filed with the board of supervisors. This was followed by such conduct on the part of Wagoner as indicated his purpose to dedicate, and the thing to which the dedication should apply, with its territorial limits. He created the territorial limits, and the public accepted the dedication within these limitations. So, as to Wagoner, there was a complete dedication to the public use of a highway within the limits marked out by him at the time he made his survey and planted his hedges and subsequently his trees and fences, all of which were placed upon the line staked out and marked by him as a southern boundary of the land dedicated to public use. These lines and boundaries have remained ever since. The public accepted its right within these boundaries, and has exercised its right within these boundaries.

We are not concerned to inquire what, if any, rights the public secured in the land north of the half-section line. These parties are not before the court, and there is no evidence of any dedication on their part; but a prescriptive right might well be urged against them, to the extent of the lands included within the highway, as used by the public during all these years.

We are not concerned to inquire what, if any, rights the public secured in land south of the south section line. These parties, too, are not before the court, and there is no

evidence of any dedication on their part; but, as to them, too, a prescriptive right might well be urged against them, to the extent of the lands included within the highway as used by the public during all these years.

No legal highway having been established, the public right in these roads is limited to land acquired either by dedication or prescription, and their rights are bounded by the territorial limitations placed upon the use by the owners. A prescriptive right cannot be acquired to any property that has not been actually used by the public for the prescriptive period. Prescription acquires for a party precisely what he has possessed, and nothing more; and, in proving prescription, the user of the right is the only evidence of the extent to which it has been acquired.

The defendants seem to make some claim, resting on a petition filed by certain landowners in July, 1871, whose land bordered upon this highway. This petition prayed that a commissioner be appointed, to view and report upon the expediency of changing the Ida Grove and Woodbury County road, where the same passes through Sections 18 and 19-87-40 and Sections 23, 25, 27, 28, 33, 32-87-41. Notice seems to have been given of the filing of this petition. A plat, with the following notations, was introduced, "Map of survey of changes in sections," reciting the sections aforesaid. Notice was given that the petition would be presented to the board at their August meeting in 1871, asking for the appointment of a commissioner to examine and make certain changes in the Ida Grove and Woodbury County line road, where said road passes through the sections aforesaid. At the August meeting, J. J. Graves was appointed commissioner to act in the above petition, the commissioner to commence his work on the 29th day of August, 1871, and to report before the 4th day of September. The commissioner reported in favor of the change as prayed, and November 4th was fixed as the day for final

hearing. The record then discloses that, on November 4th, the board made the following record:

"And now, this being the day fixed as the day for final hearing upon the above-described road, to wit, the Ida Grove and Woodbury County Line Road, and there being no objections made to the change in said road as petitioned for, the commissioner having recommended said changes and caused the same to be surveyed and staked out, it is, therefore, ordered and adjudged by the auditor that said changes be considered made and established, subject to the approval of the board."

On the margin of this was noted:

"Plat made on paper and filed with the petition and commission.  See field notes of original survey of this road."

The board thereupon made the following entry:

"And it appearing that legal notice of final hearing and no objections thereto or claim for damages having been filed, it is ordered that said road be relocated as platted by the commissioner, and the auditor is ordered to plat and record the same."

There is nothing in this record that indicates, with any degree of certainty, that these roads were involved in this action taken by the board of supervisors. The petition prayed for the appointment of a commissioner to examine and make certain changes in the Ida Grove and Woodbury County line road, where said road passes through these sections, but it does not indicate that these roads were a part of the Ida Grove and Woodbury County line road. Indeed, we infer that they were not, and for this reason, the record shows that, after the board assumed to act upon Wagoner's consent, this petition was filed and acted on. It was after this that Wagoner opened the road on these disputed lines, and staked off the territorial limitations of the road by placing hedges, fences, and trees along the line. There is

nothing, therefore, in this record to sustain defendants' contention that there was a legally established highway along the lines in dispute, other than as established by the act of Wagoner, as hereinbefore recited.

Upon the whole record, we think the court erred in refusing to grant plaintiff the injunction prayed for, and its judgment is, therefore,—*Reversed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.